WAYNE J. WYLIE ET UX *v.* ROBERT A. WOOLDRIDGE
ET UX

5-5087                                        447 S. W. 2d 851

*R. Julian Glover,* for appellants.

*Wood, Smith & Schnipper,* for appellees.

CARLETON HARRIS, Chief Justice. Wayne J. Wylie and Winnie Bell Wylie, his wife, appellants herein, are the owners of certain land lying on the south side of a bay or inlet of Lake Hamilton near Hot Springs. Robert A. Wooldridge[1] and Lois V. Wooldridge owned property partly to the west and partly to the north of appellants' property, the Wooldridge's lake frontage being on the west end of the bay. In June of 1963 the Wooldridges began to dig a channel or inlet along the south line of their property, filling in between the channel and the old shore line and to the north line of appellants' property, and appellants contend that, as a result of the fill, they have been cut off from access to

---

[1] Robert Wooldridge died subsequent to the trial, and Mose M. Holiman was named administrator of the estate, who, together with the widow, is one of the appellees in this case. However, for convenience, the term appellees may be used when referring to Mr. Wooldridge, as well as Mrs. Wooldridge.

the water front along their north line. The Wylies instituted suit in the Garland County Chancery Court in August, 1963, against appellees and Arkansas Power and Light Company, seeking an order enjoining the Wooldridges from excavating, bulldozing, filling in, or changing the contour line of appellants' property; damages were sought in the amount of $10,000.00. The complaint asserted that the Wylie land:

"* * * borders on and fronts the 400 foot contour line on Lake Hamilton and is separated from the defendants land by an inlet or channel of the backwater of Lake Hamilton. That the Defendants land is on the other side of said inlet or backwater channel of Lake Hamilton, being separated from the plaintiffs land by that portion of land between defendants and plaintiffs land below the 400 foot contour line.* * *

"That the defendants are claiming said strip of land and are trying to deprive the plaintiffs of the benefit of the waters of Lake Hamilton below the 400 foot contour line to which they are entitled."

As to the Arkansas Power and Light Company, the complaint alleges that it:

"* * * is the owner of the right to use and to flood any part of said lands by water or waters impounded by a dam or dams now or hereafter constructed and/or maintained across the Ouachita River under the authority of the Federal Power Commission. Said lands being the land in question below the 400 foot contour line between the property of the plaintiffs and the defendants, Robert A. Wooldridge and Lois V. Wooldridge, his wife."

A demurrer was filed by the power company, and was sustained by the court on July 15, 1964, appellants consenting thereto. The case then proceeded to trial, and, at the conclusion of the presentation of evidence, was

taken under advisement by the then Chancellor. However, no decree was rendered prior to the Chancellor's death, and thereafter, the cause was assigned to the Circuit Judge, acting as Special Chancellor, who decided the case on the transcript of testimony, all of such testimony having been heard by the regular Chancellor, prior to his death. A decree was rendered for the Wooldridges, and from the decree, appellants bring this appeal. For reversal, it is first asserted that the decree is contrary to the evidence, and secondly, that the decree does not conform to the court's finding of fact, and conclusions of law.

The actual question in this litigation is whether the appellees, in clearing and leveling their land while preparing a channel on their property, filled a portion of the area of Lake Hamilton at the west end of this bay below the 400-foot contour line, thereby cutting off the appellants' lake frontage for a distance of approximate-225 feet at the west end of the Wylie property. The descriptions of the lands owned by the parties are not of a great deal of aid, because they are based on a 400-foot contour line along Lake Hamilton, and no contour map was offered in evidence. Accordingly, this litigation can only be determined on the basis of the evidence offered by those who were familiar with the area. A number of witnesses testified for each side, and the testimony appears to be in irreconcilable conflict. A detailed discussion of the testimony of all witnesses would serve no useful purpose, appellants' evidence being largely directed to the contention that the area in dispute had previously contained water, prior to the fill-in. James Hall, a surveyor, testified that he took elevations around the land in question, noted a slight depression between the new fill and the old shore line, and found it to be the old 400 foot contour line, which compared favorably with an old Arkansas Power and Light Company map. A drawing, prepared by the witness, depicting elevations, was offered in evidence by the witness. Fred Thompson, a veterinarian of North Little Rock, testified that he

owned a cottage in the area, and had been familiar with the property in question since 1959. He said that he had previously fished in the area, and had observed water 100 to 150 feet from Wylie's west line. Mr. Wylie testified that he had placed a fence near the contour line to keep his cattle out of the shallow basin; that the fence was near the water line, all the way from his west line, and along the north line for a short distance. The area in the basin was covered with trees and brush, except for a creek bed. He said that the creek followed his shore line, and would be dry when the lake was down to the "395 level part * * * but when the lake was to standard level around 399 or 398," the water stood in the creek bed. The witness added that the water extended beyond his west line when the lake was "at its full 400." Mrs. Wylie testified that she had fished in the area as close as 50 feet from the west line. H. H. Wylie, a nephew, testified that in 1947 there was water in the bay to the Wylie fence line, and on a visit five or six years previously, he had observed the same condition. C. C. Wylie, a brother of appellant, testified that there was water west of the fence line in 1955, and there was a creek channel three or four or five feet wide; however, he did not know whether the water was higher than normal at the time. Olynda Bondurant, a daughter of appellants, testified that she fished near the fence line when a small child. A sister, Waneta Morris, concurred with the testimony of her sister, and she added that the area where she had fished had now been covered with dirt. Her husband, William R. Morris, agreed.

Luther Phillips, a former County Surveyor, testified that he surveyed the property when Meadows purchased it from the Arkansas Power and Light Company, and had also made a survey for Wylie in 1947. He said that the north line of Wylie's property described in the deed as "thence west along this contour line 685 feet to a point," tested out as 685 feet. The witness stated that it had been 17 years since the survey, and he could not remember any of the details. The testimony of other

witnesses on behalf of the appellant relative to whether water was in the area, or whether it was creek or lake water, was rather indefinite.

On behalf of appellees, Irving Meadows, the common grantor of both Wylie and Wooldridge,[2] testified that he had been over every foot of the territory numerous times, had seen the area twice after it was filled, and many times before, and that there had never been any water in the area in question. He said there was a "little bitty old crawdad ditch," which ran only in wet weather, but that it didn't run at the corner of the fence. "There's no water up there where he filled in, there never has been and never will be, because the lake won't put it there."

Fred Buchheit, who helped with the original Arkansas Power and Light survey, testified that, in the late spring or early summer of 1960, he looked over the area, and at that time there were trees all over the creek area; there was no water at all from the lake running back to the fence corner. He stated that, in the area filled by Wooldridge, there were pines, oaks, and gum trees, and that, based on his experience of over 20 years, he would say "no tree will live under water in this country except the willow. Pines dry (die) immediately or within two years."

Ott Livingston, County Surveyor of Garland County, testified that he was familiar with the lands of both parties. He said that, from his examination of the property before the fill was made, the lake water never ran back to the fence corner. It was his opinion, as a surveyor (and former timber inspector for the Forestry Service), that the water could not have gone beyond that point at the 400-foot level, or below, the opinion being partly based on the fact that a flooded area would kill all timber except willow and cypress. He was also of

---

[2]Wylie purchased his property from Meadows in 1947, and Wooldridge made his purchase in 1952.

the view that the description of Wylie's property was incorrect in that the 400-foot contour line did not extend for the number of feet set out in Wylie's deed. Livingston also testified that Wylie's fence had been extended:

"There's a new fence been added which went 15 feet north and circled around southeasterly, I'd say back around to the old line. There's new posts and new fence, with a few wooden boards nailed on the new fence. There's 34 feet east and west and 15 feet north, off of the old corner."[3]

Winthrop Ward testified that in 1962 he cleared underbrush for Wooldridge, and did not observe any water running back to Wylie's fence corner. This testimony was concurred in by Bill Ward.

Raymond Bates, a sawmill operator, testified that he viewed the property in 1962; that there were many trees in the area, and there was no lake water back up to the fence corner. Wooldridge testified that Wylie had never indicated to him that the lake went back to his fence corner, and he also testified that there had not been any lake water in the area in controversy.

It always seems strange when numerous people view the same property, and yet testify to opposite facts, though, of course, this is not really unusual in any type of litigation. Appellants first point out that, since the Special Chancellor did not see or hear the witnesses, and only decided the case on the basis of the record, this court and the trial court stand on the same level in determining this litigation *de novo* from the record. Though it is true that the case does not involve observation of the witnesses, and the manner in which they gave

---

[3]In the decree the court found:

"The Court finds that the Plaintiffs, immediately prior to the filing of this action, extended their existing fence line at the Northwest corner of their property approximately ten feet North of the original corner, and that this extension of the fence should be removed."

their testimony, we do not agree that the trial court's findings have no persuasive value, for we will not reverse a Chancellor, unless it appears that his findings are clearly against the preponderance of the testimony.

Such a determination cannot be made in this case. The testimony offered by appellees is, at the very least, as strong as that offered by appellant; in fact, from the standpoint of interest in the litigation, appellees' evidence is more impressive, because of the fact that several of appellants' witnesses were closely related to the wylies, either by blood or marriage. Not only that, but appellees' witnesses appear a little more positive in their statements. The witness who certainly should be in a position to know the real facts was Irving Meadows, the previous owner of the land, who testified there had never been any lake water in the area in dispute. Appellants' only answer to this testimony was that Meadows had had trouble with Wylie, though the nature of the difficulty was never shown. Buchheit and Livingston were very emphatic in their testimony that the area was covered with a variety of trees which could not have lived if the area had been under water for a number of months.

Thomas Robertson, an employee of the Arkansas Power and Light Company who testified for appellants, made three trips to the area, the first in the spring of 1963 (prior to the dredging work by Wooldridge), and the second and third visits being made at a later date. On cross-examination, referring to the third trip, Robertson said there was approximately the same amount of water in the disputed area that there had been at the time of the first visit. Appellees' Exhibit No. 5, a Soil Conservation Service aerial photograph taken on May 30, 1952, and appellees' Exhibit No. 2, taken in April, 1962, are the most clear exhibits offered, and the area in question appears in both photographs to be covered by timber and brush. Certainly, we are unable to say that appellees' dredging operation deprived appellants of lake frontage.

As to the second point, appellants assert that the court's findings, and the decree entered, in certain respects, do not conform. In its findings of fact, the court, *inter alia,* said:

"This court is not called upon to determine the ownership of the area between plaintiffs' north line and the south line of the new channel dredged by defendants, but it is conceivable that the Arkansas Power and Light Company might own this area if the parties are confined to the original 400 foot contour as their boundary. There was no accretion, so this issue is not in controversy.

"Since the defendants ceased their dredging operation and have not moved fill dirt upon plaintiffs' lands nor have the defendants, in this court's opinion, damaged the plaintiffs, it is unnecessary to issue an injunction or to award damages."

This language, say appellants, leaves the ownership of the area open. However, Paragraph 7 of the decree provides:

"The Court finds from the evidence contained in the Bill of Exceptions and the Exhibits thereto that the area in question at all times prior to the Defendants' fill and construction work in the year 1963 was at or above the 400 foot contour line and was not a part of the bed of Lake Hamilton, and did not constitute usable lake frontage adjacent to the Plaintiffs' North boundary."

This paragraph, say appellants, has the effect of placing the ownership of the disputed area in appellees. From appellants' brief:

"The findings of fact, standing alone, would permit of a reopening of a waterway along the south 400 foot contour line, either independently or in conjunction with

an agreement with Arkansas Power & Light Company (which appellants would like to do), while the decree prohibits such action.

"The appellants, therefore, contend that the decree and the findings of fact do not conform."

The need to discuss this alleged inconsistency is obviated by the fact that appellees, in their brief, concede that the issue of ownership of the property was not in question.

From the brief:

"* * * The precise issue of the ownership of the property, and of the property, was not in question. The sole question presented in the lower court concerned the loss of water front footage on the part of the appellants, allegedly because of actions by the appellees. The Paragraph seven (7) of the decree merely recites that the court found, from the evidence, that the appellees did not fill in a part of the bed of Lake Hamilton or usable lake frontage adjacent to appellants' property on the north, and therefore appellees did not take away or infringe upon any lake frontage of the appellants. The ownership of the various pieces of property was not in direct issue in the lower court, even though the findings of the court may necessarily indicate where the boundary lines of the parties are."

It is certainly correct that the ownership of the property was not in question, the court not being asked to make that determination, and, from the findings rendered prior to the entry of the decree, it does not appear that there was an intent to make a determination of ownership. In view of the court's findings, and the concession by appellees that the ownership was not in question, we make it clear that, in affirming the trial

court decree, we are not holding that the Wooldridges are the owners of the land in controversy.[4]

For the reasons herein set out, the decree is affirmed.

---

[4]It will be remembered that appellants alleged that the Arkansas Power and Light Company was the owner of the area here involved, but the company was removed from the litigation by the sustaining of its demurrer before any testimony or evidence was given. The demurrer was properly sustained, since it was not even alleged that the company had committed acts which damaged appellants, nor was any relief sought against it. Not having been a party when the case was heard on its merits, it has not had its day in court, as far as the company's rights in the land are concerned. After all, in filing a demurrer, the company only admitted the allegations of appellants' complaint, *i.e.*, that it "is the owner of the right to use. and to flood any part of said lands by water or waters impounded by a dam." In their answer, the Wooldridges denied that they had infringed upon Wylie's property, or the property rights of the Power and Light Company, and affirmatively stated that all excavations performed, and dirt moved, had been placed on their own property; However, the prayer of the answer was simply that the complaint be dismissed as to them. Also, just prior to the commencement of the taking of evidence, counsel for the Wooldridges stated:

"If the Court please, it was agreed beforehand that plaintiff had made Arkansas Power and Light Company a party to this action; that Arkansas Power and Light Company filed a demurrer; and I believe, if I'm correct, Mr. Glover, that you consent to the granting of the demurrer and the dismissal of the Arkansas Power and Light Company?

"[Mr. Glover] Yes."

It is thus made clear that the Wooldridges were not seeking an adjudication of their rights in the property as against the Power and Light Company.